Scribner, J.
This action is prosecuted to reverse a judgment rendered in the court of common pleas in favor of the Lake Shore and Michigan Southern Railway Company, John Hawks brought suit against the Lake Shore & Michigan Southern Railway Company claiming in his petition that he had been injured in one of his hands by having it crushed between the draw-bars of two cars which he was attempting to couple. He alleges therein that while he was in between the cars and attempting to make a coupling, to the knowledge of the conductor having charge of the train which he was making up, while he was attempting to pull out a pin, which had in some way become fastened, that “the said conductor carelessly, wrongfully and negligently directed the said engineer to start his said engine and the said train of cars back; and that the said engineer carelessly, negligently and wrongfully under the order of said conductor backed his said engine and the said cars, whereby and by reason of the carelessness and negligence of the said conductor and the said engineer in backing up the said train at the said time, and without any fault on the part of the said plaintiff, the said plaintiff’s right hand was caught between the draw-bars of the said two cars that were to be coupled,and mangled and crushed.”
Tbe case was tried in the common pleas to a jury, who found against Hawks. It is claimed that judgment is not supported by the evidence, and that the court erred in tbe submission of the fourth request asked by the defendant below.
We have read the evidence in this record, all of it, carefully; some of it more than once. We should have first said that they were engaged in making up a train in the Lake Shore yard, It appears from the testimony of the plaintiff below, Mr. Hawks, that the engine was attached to a train of cars, fifteen or twenty, on one of the switch *379 tracks, and it was proposed to attach it to some cars which were standing on another track. There was, standing on another track, a string of ears, coupled together, ten or fifteen in number; and there was also, some distance beyond, a string of cars — -three other cars — coupled together, and it became necessary to attach all of these cars into one train. The engine with the fifteen or twenty cars attached, pulled out of the side track it was on, on to a lead track, and then backed down on the other track on which were standing these cars. The first cars to be reached were the ten or fifteen cars, and for that purpose a brakeman by the name of Whistler was dispatched to that point to make the coupling. At the same time Mr. Hawks and another brakeman, named Ginneman, were bent together down to make the coupling when the first standing lot of cars should be backed down to the three ca^s. Hawks and Ginneman went down there. It was some little distance from, where the train would come in on that track. They went first to the long string of cais and took out the link which was in there, and then went down to the three cars,, and there they found that the pin had - become bound, and it was difficult to get it out; that it didn’t come out readily, and they didn’t get it out. The engineer backed his train down on this track, and Mr. Whistler, who was at the first batch of cars, gave his signal for the trains to back down to make the coupling. Mr. Hawks testifies in relation to his part of the transaction, that he went in there, and he says that he and “Andy” — -that is Ginneman — hammered at the pin and couldn’t get it out. He says: “He pulled up about that time — he was backing in on No. 4; he struck them pretty hard, I will admit that, and they come down and struck these three cars and bounded away,so that it left a space of four or five inches; my hand would go in easily between the two drawbars. I walks out and swings down the conductor — J couldn’t see the engineer.”
*380 ‘‘Q. Just give the signal that you gave the conductor, mow? (And the witness gave the signal.)
“Q. What did the conductor do? A. He answered me.
‘1Q. State whether he repeated it to the engineer or not ? .A, He answered me on that corner where I should judge be could see the engineer.
“Q. Then what did you do? A. I went in. I thought it was just as safe as if I was at home. I went in to put ■my link in the draw-bar.; by that time Andy says ‘Look ■out.’ I jerked my hand out just that far, and these three fingers were gone, he heard them strike above”--and the mars came together and struck him.
That statement is made by Mr. Hawks, and substantially corroborated by Mr. Ginneman, who was also » witness; and it turns largely, of course;' upon the statement of Mr. Hawks, that when he found that they were backing down this train upon him, and that he couldn’t get out the pin, he went out and gave a signal to the conductor to stop— which I presume meant also the train was then at a stop, to bold it there until some other signal should be given. The •conductor, of course,knew that he had gone down there for the purpose of making that coupling.
Mr. Winslow was also a brakeman on the same train, and he was called by the plaintiff as a witness and testifies in bis behalf, and after describing the first part of the operations, "he says that: ‘‘When the cars came down first, he was near the engine attached to the train, and Mr. Whistler ■tried to make the coupling and didn’t make it, and thereupon, of course, the engine and cars attached would come vto a full stop.” Mr. Winslow says: ‘‘Mr. Whistler tried to •make the coupling of these fifteen cars that stood in beyond there; he missed the coupling, and they ran down to the other cars and stopped; then I saw. Mr. Hawks step in to make this coupling.
‘‘Q. Then what was done? A. Mr, Whistler came out and gave a signal to back up.
*381 “Q. At that time, were the cars standing still, or not? A. The cars were standing still when Mr. Whistler came out and gave the signal to back up.
“Q. When he gave that signal to the conductor, what was done? A. Backed the cars up.
“Q. Did the conductor repeat the signal to the engineer ? A. Yes, sir.
“Q. Did you see him do that? A. Yes, sir; I stood right alongside of him at the time.
“Q. When he repeated the signal to the engineer, what did the engineer do? A. He backed the cars up so that Mr. Whistler could make the coupling.
“Q. What happened after that? A. Mr. Hawks came', out from the cars acting very queer; when I got up close: by him we could see that he was hurt.
“Q. Did you see the cars run down to those three cars?. A. Yes, sir.
It will oe observed from Mr. Winslow’s testimony that: he does not describe the signal which Hawks says he gave- and which Gfinneman says he thinks Hawks gave (for he-saw the first part of it) to the engineer to stop the train,, but he says that the train was backed down at the time-Hawks was stru-k, by the signal of Whistler only, Whistlerbéing ready to make his coupling and having failed at the-first attempt, he gave a signal to back again, and thereupon: the conductor repeated that signal to the engineer,and the engineer obeyed it, and then it was that Mr. Hawks was injured.
The conductor tells a little different story from either one of these two — a little different as to the signals that he claims were given.
Mr. Swartz was a brakeman also on the train, and he was stationed at the switch. This train came in on the lead track, and a part of it stood at that time on that track, and there was a bend in this switch track so that a person on the north side of the train could not see the engineer, and so the conductor was stationed outside of the bend, to re *382 peat the signals. He says that Swartz was standing near the switch; he was the farthest west.. Mr. Fox says, that he stationed Mr. Swartz there to receive his signals.
“Q. Was that on the engineer’s side, the north side, the engineer’s side of the engine? A. Yes, sir.
“Q. And the engine was west of you? A. The engine was west of me.
“Q. Really then, it was backing up? ' A. Yes, sir..
“Q. Mr. Whistler came out and gave you the slow signal, or stop signal, what was done then by you? A. I repeated that to Mr. Swartz.
“Q. Could you see the engine or the engineer from the place where you stood ? A. No, sir.
“Q. What was done then? A. Mr. Swartz repeated it to the engineer.
“Q. Then what was next done? A. The cars were checked up as soon as the engine could check them.
“Q Did Mr, Whistler make the coupling? A. No, sir; he missed the coupling.
“Q. After the first contact, what became of the engine, or train; did they keep on moving, or come to a stop? A. The cars that the engine had hold of came to a stop.
“Q. What became of the fifteen cars the coupling of which Mr. Whistler missed? A. They moved down a ways.
“Q. Did they come in contact with the cars below — the three cars below? A. I couldn’t say.
“Q, What next was done? A. We backed up again for Mr. Whistler to make the coupling.
“Q. Who, if anybody, gave the signal ? A. Mr, Whistler gave the signal to me to back up again to make the coupling.
‘■Q. Where was he when he gave you that signal A. He was standing there at the end of the cars, ready to make the coupling.
“Q. Where was he: at the west end of the fifteen cars, or at the east end? A. At the west end.
“Q. To whom, if anybody, did you communicate that signal? A. To Mr. Swartz.
“Q. Just describe to the jury how the train was backed? A. It was backed up very easy when the coupling was made.
*383 !‘Q. And backed in on whose signal? A. Backed in on Mr. Whistler’s signal.
‘‘Q. Did Mr. Whistler make that coupling? A. He made it the second time; yes,the second time.
“Q. Do you know Mr. Winslow? A. Yes, sir.
“Q. Did you see him there? A. Yes, sir, he was there; but I don’t know exactly what place he stood.
“Q. Was that one of the switches for him to throtv? A- Yes, he was on those switches along there.
“Q. I will ask you to state to the jury whether Mr. Hawks or Mr. Ginneman — or what, if anything, transpired with reference to this, next after Mr. Whistler made the coupling; just go on and state from that item on, what occurred? A. After Mr. Whistler made the coupling, if I remember right, I believe there was a signal given by Mr. Ginneman, a back-up signal, to make the coupling at the lower end.
“Q. That was the second coupling? A. The second coupling, yes.
‘‘Q. Do you remember whether that was Mr. Ginneman or Mr, Hawks that gave that signal to slack back? A. I think it was Mr. Ginneman.
“Q. Who was the signal given to? A. The signal — I suppose the signal was given to me, but Mr.0 Whistler took the signal and repeated it to me.
”Q. To whom did you repeat the signal? A. To Mr. Swartz.
‘‘Q. Was the engine then backed on that signal? A. Yes, sir.
‘‘Q. Then what next occurred? A. The engineer backed the train down a little ways; the next I saw the signal from Ginneman to stop the train.
“Q. On what side was he when he gave that? A. On the north side.
“Q. You may state whether or not Mr. Hawks came out from between the cars and gave you a signal to stop the train? A. No, sir, I didn’t see no signals given from the lower end to stop the train until Mr. Ginneman gave the signal, as I have stated.
“Q. How soon after that did you see Mr. Hawks? A. Why, very shortly afterwards. Mr. Hawks came walking up, Mr. Hawks and Mr. Ginneman.”
*384 Mr. Fox in his story was substantially corroborated by Mr. Whistler, and probably by Mr. Swartz, so far as he saw; and there we have substantially the three stories which were given to the jury with reference to these signals: First, the claim of the plaintiff, that he distinctly gave a signal that the train should be stopped and he held, so that he might make that coupling, or might get the pin out and get it arranged to make the coupling. Second, the story of Mr. Winslow, that he didn’t give any such signal, but that the signal upon which the train was backed when Hawks was injured, was given by Mr. Whistler, a fellow brakeinan. Third, the story of the conductor, who says that there was a signal given by Mr. Ginneman, he thinks, who was with Hawks, but it was a signal to back up, and that he repeated that signal to the engineer,and the engineer then backed up.
There is also a little more evidence, going to show that shortly after the accident Mr. Hawks made a statement of how he was injured, in which nothing appears as to his giving a signal to the conductor J;o stop the train; and upon that evidence the jury found a verdict for the railway company.
I will say that we have examined this record very carefully, and we are not prepared to say that the jury were not warranted in finding a verdict in behalf of the defendant. Certainly, if the story of the conductor is to be believed, he was-not at all to blame. If he received a signal from Hawks, or from the man who was with him, engaged in the same identical work, to back up the train, and he repeated that signal to the engineer, he did just what it was his duty to do; he was nowhere near Hawks, and it is not pretended that he knew anything about the fact that the pin was stuck in the draw-bar. He knew, or ought to have known, that Hawks was down there to make that coupling, and if he had any information from him that there was anything the matter, of course it was his duty to obey that in *385 formation and stop the train, and not to back it up; but he received the information from Hawks or his partner that the train should be backed up, he would be justified in submitting that signal to the engineer and backing the train-up. And I think also, if the testimony of Mr. Winslow be true, that the company would not be liable. His story is that the signal was given to back up the train by the giving of the motion employed in their method of working. It was Mr. Whistler, who was a fellow brakeman, who gave it, although Whistler didn’t know at the time anything about Hawks’ trouble with the pin; yet whatever he did in that respect, the company would not be liable for, there being no evidence to show that the conductor had any notice or knowledge that Hawks was in any trouble about releasing the pin. Of course, if the claim of Mr. Hawks be true — that he gave a signal there to indicate to the man managing the train that he couldn’t get the pin out, and that the train should be held, then, of course, it would be the duty of the conductor to obey the signal. But we do not discover anything from this testimony which would justify us in setting aside this verdict.
There is an exception to the fourth request. It is, possibly, objectionable, but we think it relates to the omission of matter which might have properly been inserted in it, and which the plaintiff should have availed himself of by a request to the court to further charge.
The request was:
“4. If the jury find now from the evidence, that injury to the plaintiff resulted from the negligent act of Mr, Whistler in giving the signal to back, and on such signal the train was backed, and the plaintiff was injured in consequence of such negligent act of Whistler, then there can be no recovery in this action”
That is true. The testimony of Mr. Whistler makes that kind of a case, substantially, and in view of the testimony *386 of Mr, Winslow as well, I think that request is proper, and the court would not reverse the case on that ground,
H. Scribner, for Plaintiff in Error,
.27, D. Potter, Jr., for Defendant in Error.
The judgment will be affirmed.